[Cite as *State v. Cook*, 2017-Ohio-7953.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2016-L-079** |
| KENNETH TYRONE COOK, SR., | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2015 CR 000912.

Judgment: Affirmed.

*Charles E. Coulson,* Lake County Prosecutor, and *Karen A. Sheppert,* Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Charles R. Grieshammer,* Lake County Public Defender, and *Vanessa R. Clapp,* Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, P.J.

{¶1} Appellant, Kenneth Tyrone Cook, Sr., appeals his conviction, following a jury trial, in the Lake County Court of Common Pleas of kidnapping, rape, and felonious assault. The lead issues are whether the trial court committed plain error in allowing a Sexual Assault Nurse Examiner to testify as an expert and in not giving lesser-included-offense jury instructions. For the reasons that follow, we affirm.

**{¶2}** Appellant was charged in a ten-count indictment with kidnapping, a felony-one (Count 1); kidnapping, a felony-one (Count 2); kidnapping, a felony-one (Count 3); kidnapping, a felony-one (Count 4); felonious assault, a felony-two (Count 5); felonious assault, a felony-two (Count 6); domestic violence, a felony-three (Count 7); kidnapping, a felony-one (Count 8); rape, a felony-one (Count 9); and sexual battery, a felony-three (Count 10). Appellant pled not guilty and the case was tried to a jury.

**{¶3}** Sarah Weber testified that in October 2015, she was living in a single-family residence on Overlook Dr. in Painesville Township with her two boys, age 9 and 13, and appellant. Sarah had known appellant for about 12 years and lived with him in a boyfriend-girlfriend relationship in her home from the end of 2014 until September 2015. Their relationship was unstable at best and they argued constantly. Although they were broken up from June until mid-September 2015, appellant continued to live there. Their intimate relationship resumed in mid-September.

**{¶4}** In late September, Sarah learned she was pregnant and told appellant. Their relationship did not improve. Sarah asked him to move out several times, but he refused.

**{¶5}** During the evening on Thursday, October 22, 2015, while Sarah's children were in the living room watching television, she was in her bedroom with appellant. She told him their relationship was not working out; that she was not happy; and that he needed to move out. She also said she might have become pregnant while they were not together so the baby may not be his.

**{¶6}** Appellant became furious and started arguing with Sarah. As appellant was walking out of the bedroom, he took Sarah's cell phone and threw it across the

2

room.  Appellant went in the living room and took the keys to Sarah's car from a window ledge in the front doorway and Sarah tried to stop him because she did not want him to take her car.

{¶7} Sarah was trying to grab the keys from his hand.  She grabbed his shirt and hit him.  Appellant struck her in the face.  He then pushed her and she fell to the floor.  Appellant left for a few minutes, then returned and, in the presence of her children, he grabbed her by her hair and dragged her out of the house, down the stairs, and to the car.  Sarah was only wearing shorts and a t-shirt with no shoes or socks.  Appellant opened the driver's door.  He pushed Sarah in the car and into the passenger seat.  While they were leaving, Sarah looked back and saw her youngest boy looking out the side window by the front door.  Appellant was punching Sarah in the car.  He called her a "b _ _ _ _" and a "w _ _ _ _," and said she would be lucky if she made it alive."

{¶8} Appellant stopped the car on Bank Street, an industrial area, near a large abandoned building.  He kept asking Sarah who the other possible father was.  She gave him the name of a man appellant knew and he backhanded her in the face.  Appellant then got out of the car and took Sarah's car keys with him.  He came over to the passenger side and dragged her out of the car and pushed her to the ground.  He was yelling at her, calling her names, and kicking her in the legs, arms, back, and the back of her neck.

{¶9} Suddenly, appellant stopped kicking her and got back in the car.  Sarah started walking away from the car.  She heard the car accelerate and she started to run.  She ran across railroad tracks, and, when she looked back, she saw appellant driving

3

the car directly at her. She jumped on top of a picnic table on the side of the building. The car stopped just inches from the table. Sarah said that if she had not jumped on the table, the car would have hit her.

{¶10} Appellant got out of the car and forcibly put her in the passenger seat. While appellant was driving, he was hitting her, grabbing her hair, hitting her head against the steering wheel, and spitting on her, all the while calling her a "w _ _ _ _." Sarah tried to get out of the car a few times, but every time, he pulled her back.

{¶11} After driving awhile, they were stopped by a train. Appellant turned the car light on and looked at Sarah's face. He made a phone call. Sarah recognized the voice on the other end of the line as that of appellant's friend Melissa Nicholson. He told Melissa she was going to have to pick him up from jail because, he said, "I just gave this b _ _ _ _ a black eye."

{¶12} Appellant then drove to a Convenient Food Mart on Madison Ave. When he pulled into the parking lot, he was still on the phone with Melissa. He parked and got out of the car, taking Sarah's keys with him. Appellant went in the store and Sarah looked at the bruises on her face in the mirror on her visor.

{¶13} Appellant returned to the car and drove back to Sarah's house. When they arrived, Sarah walked in the front door, but went straight to her bedroom because she did not want the boys to see her face. Appellant followed her. Once inside Sarah's bedroom, appellant immediately started arguing with her. He took a picture of Sarah's bruised face on his phone and said "look how stupid you look." He said he was going to send the picture to the father of her baby so he could see what he did to her. Appellant sent him a Facebook message on Sarah's other cell phone, saying, "Well since you f _

4

_ _ _ _ my girl she got pregnant with your kid. Good luck." Sarah later retrieved this message, which appellant sent at 10:55 p.m., and gave it to police.

{¶14} At that time Sarah sent a Facebook message to her sister, Jennifer, who had made arrangements to come to Sarah's house the following morning. Sarah messaged Jennifer not to come because she was not going to be home. Sarah was concerned because she did not know if appellant would still be there when Jennifer arrived.

{¶15} Appellant left the house and Sarah asked her boys to help her find the battery for her cell phone in her room. Shortly thereafter, appellant returned and the boys went in their bedroom.

{¶16} Appellant called Melissa again and after they talked for awhile, appellant got off the phone and backhanded Sarah again in her face. Appellant asked Sarah what she and the other male had done sexually. He said he wanted to know what they did so they (he and Sarah) could reenact it. Sarah refused, but he got on top of her and forced her to engage in sexual conduct on the floor. Sarah was crying and kept trying to back away from him, but he kept pulling her back.

{¶17} When appellant was done, he left the house, and Sarah sent her sister Jennifer the following message at 11:53 p.m.:

{¶18} Please don't [message] me back about this. I will call u in the morning [because I'm] afraid he's going to come back home but I told him [about the baby] and he be[a]t the shit out of me. He ha[s] my car. I need to go to the police station in the morning and I know u have to work but I don't want anyone else to see right now. So I really need u. I [don't know] what else to do. I want to call the cops now but I'm scared.

5

{¶19} Sarah said she did not sleep at all that night because her whole body was sore and she could feel her face throbbing.

{¶20} Early the next morning at about 6:30 a.m., Sarah called Jennifer and told her that appellant beat her up. Jennifer had not seen Sarah's two messages from the night before. Sarah asked Jennifer to come and pick her and her boys up and take them to the police station. Jennifer was crying and said she was on her way. Sarah woke the boys up; they dressed quickly; and then waited for Jennifer to arrive.

{¶21} Sarah realized that appellant's work clothes were at her house and he would probably come back for them that morning so Sarah and the boys left the house. They were running down the street when Jennifer saw them and picked them up.

{¶22} As Jennifer continued driving, they passed appellant who was driving Sarah's car in the opposite direction toward Sarah's home. Jennifer drove to the Painesville police station and then to Tri-Point Hospital. Sarah was examined by Sexual Assault Nurse Examiner ("SANE") Trisha McCurdy. Nurse McCurdy said Sarah was tearful, very sore, and in great pain. Her tailbone was in pain and it was difficult for her to sit. Nurse McCurdy said Sarah had sustained blunt force trauma to her face. She said Sarah had obviously been struck in the face and her injures were serious. Her face was very swollen. She had extreme swelling and redness and tenderness to both eyes to the point where her right eye was swollen shut. She had bruising and swelling to her cheeks and bruising around both eyebrows. She had abrasions to her head and neck. She had abrasions to her forehead (which are now scars). Her mouth was swollen and her lower lip was bruised. She had scratch marks to her face, which were bleeding.

She had bruises behind her right ear. She had swelling and pain in both upper arms. Sarah said the pain from her injuries lasted about two weeks.

{¶23} Sarah told Nurse McCurdy and the responding Lake County Sheriff's Deputy that her boyfriend Kenneth Cook had assaulted and punched her. However, she did not tell them she had been sexually assaulted because she did not know this was rape and also because she was ashamed and afraid of appellant.

{¶24} Lake County Sheriff's Detective Robert Izzo testified that appellant was arrested on a warrant during the evening on Friday, October 23, 2015. The following Monday, October 26, 2015, he met with appellant at the jail, and after Mirandizing him, appellant agreed to be interviewed. He said that after learning Sarah's baby may not be his, he was calm and tried to leave the house, but could not because she pulled on his shirt, trying to prevent him from leaving. He said he agreed to take a ride with her. He said they drove on Bank St. (the industrial area where Sarah said appellant almost hit her with her car), but appellant did not say they stopped there, Instead, he said they continued driving. He said that while driving, Sarah assaulted him in the car. He said he stopped at Jackie's Bar on State St. and tried to get help from patrons of the bar. He said that a female bar patron came over to the car and beat up Sarah and that is how she sustained any injuries. Appellant repeatedly said he never hit Sarah that night. He said that after the altercation at the bar, he took her home. Appellant said he asked her if she would show him how she had sex with the other male so they could reenact it. He said she willingly complied, and they had sex, which he repeatedly referred to as "consensual." Although appellant said Sarah assaulted him, the only injury he showed the detective was some minor swelling at the top of his right hand.

7

{¶25} Following appellant's arraignment on October 26, 2015, Detective Izzo met Sarah for the first time at court, and asked her if she and appellant had had sex that night because appellant was so open about it during his interview. She said they did, but that it was not consensual. Sarah told Detective Izzo that she had been in contact with her sister Jennifer that night and had sent her text messages, which should be on her phone. Jennifer was at the arraignment with Sarah, so Detective Izzo went in the jury room with her and took photos of the messages Sarah had sent her.

{¶26} After talking to Sarah, Detective Izzo learned about the stops she and appellant made on Bank St. and at the Convenient Food Mart. Appellant had not mentioned they stopped at either location. The detective said he wanted to look at Convenient's security video to see if it corroborated Sarah's statement.

{¶27} Detective Izzo said he obtained a copy of Convenient's video, which showed that at 11:25 that night, appellant and Sarah were in the Convenient parking lot and that he exited Sarah's car holding a cell phone in one hand and car keys in the other. The video shows appellant walking in the store, staying in there for one minute, and Sarah looking at her face in the visor mirror.

{¶28} Detective Izzo said he investigated appellant's claim that Sarah was beaten by a patron at Jackie's Bar. The detective went to the bar and talked to Sacha Wancho, the sole bartender on duty that night. She testified there was no fight or any other disturbance at the bar that night.

{¶29} Melissa Nicholson, appellant's friend, testified as a court witness. She said that appellant called her that evening and told her he backhanded Sarah in the face. Melissa said that appellant stayed with her that night, and he never said Sarah

8

was assaulted at Jackie's Bar. Melissa said that while visiting appellant at the jail, he told her to find a "coke head" named Sean and have him say he saw Sarah get into a fight that night.

{¶30} Detective Izzo interviewed Sarah's two boys. The detective said what they told him was consistent with what Sarah said. The boys testified at trial they saw their mother try to take her keys from appellant. They saw him push her to the floor and then drag her out of the house by her hair to the car. The nine-year old said he saw appellant hit his mother's face in the living room and then, while he was looking out the window and watching appellant and his mother in the car, he saw appellant hit her many times.

{¶31} Detective Izzo said he went to the industrial area on Bank St. that Sarah mentioned. He found the abandoned building, picnic table, and railroad tracks, which corroborated Sarah's testimony.

{¶32} Detective Izzo said that appellant called Melissa Nicholson from jail and in that recorded conversation said to her, "So what ok so I backhanded her * * *."

{¶33} Appellant did not testify and did not present any witnesses to testify on his behalf.

{¶34} The jury returned a verdict finding appellant guilty of all ten counts. The court merged Count 2 (kidnapping), Count 3 (kidnapping), Count 4 (kidnapping), and Count 7 (domestic violence) into Count 5 (felonious assault). The court also merged Count 8 (kidnapping) and Count 10 (sexual battery) into Count 9 (rape).

{¶35} The trial court considered that appellant was convicted of felonies almost every year from 1997 to 2010 and sentenced four times to prison. Pertinent here, he

9

was convicted of *domestic violence in 1999*; *domestic violence, a felony-five*, in 2000 and sentenced to six months in prison; falsification in 2006; *attempted domestic violence, a felony-four*, in 2009 and sentenced to eight months in prison; and *domestic violence, a felony-three*, and *violation of a protection order*, a felony-three, in 2010 and sentenced to four years in prison, to be served consecutively to the eight-month sentence in the 2009 case.

**{¶36}** The trial court sentenced appellant to six years on Count 1 (kidnapping); seven years on Count 5 (felonious assault); five years on Count 6 (felonious assault): and ten years on Count 9 (Rape), the sentences to be served consecutively to each other for a total of 28 years in prison.

**{¶37}** Appellant appeals, asserting four assignments of error. For his first, he alleges:

**{¶38}** "The trial court committed plain error in violation of the defendant-appellant's state and federal constitutional rights to fair trial and due process when it permitted the SANE nurse to testify as an expert witness."

**{¶39}** At trial the state called Christi Laprairie, a Sexual Assault Nurse Examiner, who testified as an expert witness. She did not examine Sarah, but testified concerning delayed reporting by victims in sexual assault cases. Appellant does not challenge Nurse Laprairie's qualifications. Rather, he argues the trial court committed plain error in allowing Nurse Laprairie's testimony regarding delayed reporting and consent because such matters are not beyond the knowledge or experience of lay persons, as required by Evid.R. 702(A). He also argues Nurse Laprairie did not examine Sarah.

10

{¶40} "The determination of the admissibility of expert testimony is within the discretion of the trial court. Evid.R. 104(A). Such decisions will not be disturbed absent abuse of discretion." *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶9. However, defense counsel did not object to Nurse Laprairie's testimony. Appellant thus waived all but plain error.

{¶41} Crim.R. 52(B) allows us to correct "[p]lain errors or defects affecting substantial rights" that were not brought to the attention of the trial court. In *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), the Supreme Court of Ohio set forth very strict limitations on what constitutes plain error. "First, there must be an error, i.e., a deviation from a legal rule." *Id.* Second, the error must be plain, i.e., the error must be an "obvious" defect in the proceedings. *Id.* "Third, the error must have affected 'substantial rights.'" *Id.* The defendant has the burden of demonstrating plain error. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶17. A reversal is warranted only if the defendant can prove the outcome would have been different absent the error. *Id.* The decision to correct plain error is discretionary and should be made "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Barnes, supra*, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶42} Appellant does not reference the specific testimony of Nurse Laprairie with which he takes issue. He objects in general to her testimony regarding delayed reporting of sexual assault and consent in such cases. However, without citing the specific testimony that he claims did not satisfy Evid.R. 702(A), appellant has failed to properly raise this issue. App.R. 16(A)(7).

11

{¶43} In any event, Nurse Laprairie testified she was an emergency room nurse for 17 years and has been a licensed Sexual Assault Nurse Examiner ("SANE") for three years. She took the necessary training to be licensed as a SANE and she takes continuing education to maintain her license. She has conducted more than 400 examinations as a SANE in sexual assault cases. She said that, based on her experience, many victims delay reporting sexual assault for a variety of reasons, such as fear. She said that in cases involving intimate partner sexual assault, victims often delay reporting the sexual assault because they believe that, due to the existence of the relationship, sexual assault is not rape. She also said that in such cases, victims often delay reporting sexual assault because they are afraid others will not believe them due to the relationship.

{¶44} This court has stated that "[t]he post-shock reactions of a rape victim are important to a proper corroboration of testimony of the victim that she was, in fact, raped. Likewise, these reactions may manifest themselves in a lesser degree when observed by the average layman. Expert opinion is necessary to properly interpret the reactions. This is probably more important in child rape cases than in adult situations." *State v. Whitman*, 16 Ohio App.3d 246, 247 (11th Dist.1984). This court stated that "although the admission of evidence of this nature has a prejudicial impact on the defendant's claim of innocence, the probative value of this testimony clearly outweighs the prejudicial impact" because "the testimony of the expert witness tended to explain the psychological trauma experienced by the rape victim." *Id.*

{¶45} The Ninth District, in *State v. Moore*, 9th Dist. Medina No. 1736, 1989 WL 21233 (March 8, 1989), applied this court's decision in *Whitman*, a child-rape case, to a

case involving an adult victim who did not report the rape for ten days. At trial, the state presented a psychologist who had never examined the victim, but, rather, gave his opinion describing a victim's range of reactions to a rape. On appeal, Moore argued such testimony is within the knowledge of the average juror. The Ninth District disagreed and allowed the testimony, stating:

{¶46} Perhaps the jury * * * would have been capable of deciding whether [the victim's] reactions would be typical of an adult confronted with such a traumatic event. However, as said in 4 Weinstein's Evidence 702(02) (1981), there is no bright line to demarcate those issues which are within the comprehension of the jury from those which are not.

{¶47} Wide latitude is given to the court in determining the admissibility of expert testimony and we review the admissibility of evidence under an abuse of discretion standard.* * * Under these circumstances, we find no abuse of the trial court's discretion where the testimony helped those jurors unacquainted with the trauma which would accompany such a violation of one's physical and emotional integrity * * *. *Moore* at *6.

{¶48} The Ninth District also applied this court's decision in *Whitman* in *State v. Grandberry*, 9th Dist. Lorain No. 94CA005781, 1994 WL 527910 (Sep. 28, 1994), a rape case in which the victim delayed reporting the rape for several days. The trial court allowed a veteran police detective, who had investigated many rape cases, to testify it is not uncommon for rape victims to delay reporting the rape to authorities. The Ninth District held the detective's testimony was relevant because it would help jurors understand why the victim delayed reporting the rape. *Id.* at *4. Further, the court held the probative value of the expert's testimony to explain the victim's delay outweighed any prejudicial effect because he was subject to cross-examination and, thus, the defense had the opportunity to counter any possible prejudice. *Id.*

13

{¶49} Further, in *State v. Solether*, 6th Dist. Wood No. WD07053, 2008-Ohio-4738, another rape case, a police detective, who had investigated some 200 sexual assault cases, testified that, based on his training and experience, it is not unusual for rape victims to delay reporting the rape for a variety of reasons. The Sixth District found no error, stating:

> {¶50} Although Officer Gates' testimony about delayed reporting was based largely upon his personal experience, *the fact that delayed reporting by sexual assault victims is not uncommon is not within the knowledge of the average juror.* Thus, because Gates' testimony required "specialized knowledge" it is properly categorized as expert testimony. * * *

> {¶51} [W]e find that Officer Gates had a sufficient degree of specialized knowledge to testify regarding delayed reporting by sexual assault victims. (Emphasis added.) *Id.* at ¶65-69.

{¶52} Turning now to appellant's arguments, he contends that because Nurse Laprairie did not examine Sarah, the nurse was not competent to testify. However, Evid.R. 703 does not require that an expert's opinion be based on facts perceived by him. Further, Ohio appellate courts have allowed experts to testify as to the common reactions of rape victims without having examined the victim. *Moore, supra.* The fact that Nurse Laprairie did not examine Sarah was pertinent only to challenge the nurse's credibility.

{¶53} Further, appellant argues that because Sarah is not a child, Nurse Laprairie's expert testimony was not necessary and was thus inadmissible to explain why Sarah delayed reporting. However, the Ninth District in *Grandberry, supra*, held that *child* rape cases do not provide the only factual scenario in which an expert may testify regarding delay in reporting sexual assault. *Id.* at *5. The court held that such testimony need not be confined to cases of child sexual assault. *Id.* The court

14

explained that the relevance, scientific acceptance, and probative value of such testimony precludes limiting it to child rape cases. *Id.*

{¶54} Appellant also argues that because Sarah was able to explain why she delayed reporting, Nurse Laprairie's testimony was unnecessary. However, while Sarah was able to state her reasons for not initially reporting the rape, that does not mean the jury would understand her reasons are typical of rape victims. Further, because Sarah testified that, in the circumstances, she did not know appellant's sexual conduct was rape, it stands to reason the jury may not have known that either.

{¶55} Nurse Laprairie's testimony was offered to explain to the jury that a delayed report by a sexual assault victim is not uncommon. Her testimony should have been limited to that purpose; any testimony that went further, if objected to, should not have been permitted. The victim in this case testified as to why she did not immediately report that she had been sexually assaulted. Nurse Laprairie's testimony as to other reasons why a victim might delay reporting was therefore irrelevant. However, the admission of this testimony does not rise to the level of plain error as there was substantial other evidence to support appellant's conviction.

{¶56} Appellant's second assigned error alleges:

{¶57} "The defendant-appellant was deprived of his constitutional rights to fair trial and due process when the trial court failed to give lesser included offense instructions on two of five counts of kidnapping."

{¶58} Appellant argues that, while the trial court gave jury instructions for the lesser included offenses of abduction and unlawful restraint with respect to kidnapping as charged in Counts, 1, 2, and 8, the guilty verdicts for kidnapping in Counts 3 and 4

15

violated his right to a fair trial and due process because the court did not give these instructions with respect to those counts.

{¶59} The decision of whether to give a particular jury instruction lies within the trial court's discretion. *State v. Nichols*, 11th Dist. Lake No.2005-L-017, 2006-Ohio-2934, ¶28. However, appellant concedes he did not object to the court's instructions. In fact, when the trial court explained why it did not believe the lesser included offense instructions were warranted under Counts 3 and 4, *defense counsel said he agreed.*

{¶60} Crim.R. 30(A) provides in relevant part: "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Thus, having waived any error related to the trial court's decision not to give this instruction, our review is precluded unless appellant demonstrates the existence of plain error.

{¶61} However, appellant faces a more fundamental obstacle in challenging the verdicts on Counts 3 and 4 because, due to the merger of these counts with Count 5, appellant was not sentenced on Counts 3 and 4 and thus was not convicted of them.

{¶62} The Supreme Court of Ohio, in *State v. Powell*, 49 Ohio St.3d 255, 263 (1990) (superseded by constitutional amendment on other grounds), stated: "Since the trial court merged the kidnapping convictions with one another, [the defendant] received only one sentence for kidnapping and an erroneous verdict on Count Three would be harmless beyond a reasonable doubt." *Accord State v. Wolff*, 7th Dist. Mahoning No. 07 MA 166, 2009-Ohio-2897, ¶70 ("When a trial court dispatched with a count through merger, any error in the jury's verdict on the merged count is rendered harmless beyond

16

a reasonable doubt."); *State v. Williams*, 4th Dist. Scioto No. 11CA3408, 2012-Ohio-4693, ¶54.  In *Williams*, the Fourth District stated:

> **{¶63}** Here, the record reflects that although the jury did return a finding of guilt as to * * * count 10, the trial court "ordered that count 10 merge with Count 1 and Count 2." Thus, despite the jury's finding Williams guilty on count 10, the trial court did not impose a sentence for count 10. "A conviction consists of a finding of guilt and a sentence." *State v. Fields*, 1st Dist. No. C-090648, 2010-Ohio-4114, ¶7, citing *State v. Henderson*, 58 Ohio St.2d 171, 177-179 (1979) * * *. As such, although the jury found Williams guilty of count 10, the trial court did not impose a sentence for count 10 and as a result, Williams was not convicted of count 10. Therefore, there is no conspiracy conviction to vacate.

**{¶64}** Here, because the trial court merged the kidnapping offenses in Counts 3 and 4 with felonious assault in Count 5, appellant was only sentenced on Count 5 and thus was only convicted of Count 5.  As a result, any error in the guilty verdicts for Counts 3 and 4 was harmless beyond a reasonable doubt.

**{¶65}** In any event, in light of the overwhelming evidence of appellant's guilt, he failed to demonstrate the existence of plain error.

**{¶66}** For his third assigned error, appellant alleges:

**{¶67}** "The defendant-appellant's constitutional rights to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution were prejudiced by the ineffective assistance of counsel."

**{¶68}** The Ohio Supreme Court has held "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136 (1989),

17

paragraph two of the syllabus, following *Strickland v. Washington*, 466 U.S. 668 (1984). In order to demonstrate prejudice, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different." *Strickland, supra*, at 694.

{¶69} Moreover, "'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, * * * that course should be followed.'" *Bradley, supra,* at 143, quoting *Strickland, supra*, at 697.

{¶70} Appellant asserts two grounds in support of his ineffectiveness claim. First, he relies on trial counsel's failure to object to the testimony of Nurse Laprairie. However, pursuant to our analysis under the first assignment of error, the trial court did not abuse its discretion in allowing this testimony. Thus, even if counsel had objected, the objection would not have been well taken. As a result, trial counsel's failure to object did not prejudice appellant, and does not support his ineffectiveness claim.

{¶71} Next, appellant argues that because his trial counsel did not object to the trial court's failure to instruct the jury as to the lesser included offenses of kidnapping as to Counts 3 and 4 of the indictment, his counsel was ineffective. However, as discussed under the second assignment of error, because appellant was not convicted of these counts, any error by his attorney in not objecting to the instructions was harmless and he was not prejudiced.

{¶72} For his fourth and last assignment of error, appellant contends:

{¶73} "The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."

{¶74} In reviewing the manifest weight of the evidence, the appellate court reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1983). "The power to reverse on 'manifest weight' grounds should only be used in exceptional circumstances, when 'the evidence weighs heavily against the conviction.'" *State v. Banks*, 10th Dist. Franklin No. 09AP-13, 2009-Ohio-4383, ¶14, quoting *Thompkins* at 387.

{¶75} Further, we must "give great deference" to the jury's assessment of witness credibility. *State v. Covington*, 10th Dist. Franklin No. 02AP-245, 2002-Ohio-7037, ¶28. The jury is charged with assessing a witness' credibility, and an appellate court cannot substitute its judgment for that of the jury. *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). "[T]he [jury] is free to believe all, part, or none of the testimony of each witness appearing before it." *Warren v. Simpson*, 11th Dist. Trumbull No. 98-T-0183, 2000 WL 286594, *8 (Mar. 17, 2000). A reviewing court must interpret the evidence consistent with the verdict if it is susceptible to more than one interpretation. *Id.*; *State v. Haines*, 11th Dist. Lake No.2003-L-035, 2005-Ohio-1692, ¶82.

{¶76} Here, appellant does not challenge the sufficiency of the evidence; he thus concedes his conviction was supported by sufficient evidence. Further, he does not

challenge any of the specific counts of which he was convicted as being against the manifest weight; rather, he argues generally that his conviction was against the manifest weight of the evidence.

{¶77} Appellant argues Sarah was unreliable because her initial reports to her sister, the hospital, and the deputy did not mention the sexual assault. However, the trauma Sarah endured that night (physical and mental), her embarrassment over the demeaning acts to which she was subjected, and the fact that she did not know the attack was rape due to her relationship with appellant explain her delayed reporting. Further, Sarah's delay in reporting was explained by Nurse Laprairie and Nurse McCurdy as a common reaction by victims of sexual assault.

{¶78} Appellant argues that Sarah was the aggressor in the doorway because she pulled him by his shirt and blocked the front door. However, this evidence was consistent with Sarah's testimony that she was trying to prevent him from taking her car. He also said she assaulted him in the car. However, the only injury he had was some minor swelling to the top of his right hand, which was consistent with the testimony that he repeatedly backhanded Sarah in the face.

{¶79} Appellant questions Sarah's credibility because he left her alone in the car a few times so she could have exited the car. However, the evidence shows Sarah was never out of his sight and he took her car keys each time he left. Moreover, Sara explained that if she tried to escape, he could get to her house before she could and she was afraid because her boys were home alone.

{¶80} Appellant argues his explanation of events was consistent. However, in making this argument, he ignores Sarah's terrible injuries; the fact that video

20

surveillance shows they went to Convenient; the fact that his story about a bar patron beating up Sarah was refuted by the bartender; and the fact that Melissa testified appellant admitted he backhanded Sarah in the face and asked her (Melissa) to find a coke head friend of his and have him say he saw Sarah get into a fight that night.

{¶81} Appellant's argument that he and Sarah had "consensual sex" makes no sense in light of his hitting Sarah (as admitted by appellant), his dragging her out of the house that night (as testified to by the children), and Sarah's serious injuries and pain.

{¶82} In finding appellant guilty, the jury obviously found Sarah's testimony more credible than appellant's unsworn and uncorroborated comments to Detective Izzo. In reaching its verdict, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that appellant is entitled to a new trial.

{¶83} For the reasons stated in this opinion, the assignments of error are overruled. It is the order and judgment of this court that the judgment of the Lake County Court of Common Pleas is affirmed.


TIMOTHY P. CANNON, J.,

THOMAS R. WRIGHT, J.,

concur.