[Cite as *State v. Harris*, 2018-Ohio-578.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105284**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# WALTER HARRIS

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-592778-A

**BEFORE:** Jones, J., Keough, P.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** February 15, 2018

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, Ohio 44116


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY: Jeffrey Schnatter
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., J.:

{¶1} Defendant-appellant, Walter Harris ("Harris"), appeals his convictions on multiple counts related to the sexual assault of H.S. We affirm.

## I.  Procedural History and Facts

{¶2} In 2015, Harris was charged with 28 counts as follows:  nine counts of rape, eight counts of kidnapping, six counts of sexual battery, four counts of gross sexual imposition, and one count of attempted rape.  The counts were accompanied by various repeat violent offender and sexual motivation specifications.  The date of Harris's offenses ranged from March 1, 2012 to June 2014, and the victim was his girlfriend's minor daughter.

{¶3} The matter proceeded to trial in April 2016, but the jury was unable to reach a verdict.  The case proceeded to a second jury trial in May 2016 on 27 counts because the state dismissed one count of rape prior to the second trial.  The repeat violent offender and sexual motivation specifications were tried to the court.

{¶4} The following pertinent evidence was presented at trial.

{¶5} Harris dated H.S.'s mother.  H.S. did not have a stable home life.  At first, H.S. and her brother, "E.S.," lived out of state with their mother.  Because Harris lived in Cleveland, H.S. would visit with her mother and brother on the weekends.  H.S. subsequently lived with her grandmother, her mother in a homeless shelter, and finally with Harris and E.S.

{¶6} Harris eventually became the legal guardian of H.S. and E.S.  H.S. testified

that she thought of Harris as her "father." From 2005 through 2012, H.S. lived with Harris, E.S., and Joanna Wilcox ("Wilcox"), who was dating Harris. Harris and Wilcox's relationship ended in September 2012 and Wilcox moved out. H.S. and Wilcox remained friends.

{¶7} When H.S. was in the eighth grade, she discovered she was attracted to girls. Harris found out and was mad. H.S. testified that Harris first assaulted her when she was in the eighth grade and after Harris found out she was gay. One night, Harris called H.S. downstairs. According to H.S., there was a pornographic movie playing on the television, depicting two females. Harris grabbed H.S.'s arm, threw her down onto his bed, and touched her. H.S. testified that although she did not want Harris to be touching her in that way, she was frightened and did not feel that she was able to get away.

{¶8} H.S. testified that the next instance occurred toward the beginning of her ninth grade school year. E.S. was at school and H.S. was on the couch. Harris approached her with his pants off and touched her. Again, H.S. was frightened but did not feel like she could leave.

{¶9} H.S. testified that after Wilcox moved out, Harris was "lonely" and wanted H.S. and E.S. to sleep in his bedroom. The siblings slept on couch cushions on the bedroom floor. During one of these nights, H.S. remembered she was at a friend's house for the evening. She returned home, fell asleep on the couch cushions, and woke up in Harris's bed without pants. Harris touched her.

{¶10} H.S. testified that eventually Harris's assaults escalated to sexual

intercourse. H.S. testified that one such occurrence took place when she was in the tenth grade, before Harris moved them from their house on East 64th Street to a house on Homer Avenue. H.S. remembered she had been sleeping on the couch because she was sick. During the night, she got up to get a drink of water; when she returned, Harris was sitting on the couch waiting for her. Harris told H.S. to come to his bedroom, where he had sex with her.

{¶11} The sexual abuse continued after they moved to the new house. H.S. testified to another instance that occurred shortly after the move, sometime between the Thanksgiving and Christmas holidays. Harris called H.S. into his bedroom and told her that they needed to "mess around." H.S. testified that Harris grabbed her, took off her pants, turned her around, and made her have sex with him.

{¶12} According to H.S., the last time Harris assaulted her was toward the end of 2014. She testified that Harris continuously and repeatedly raped and sexually assaulted her until the end of 2014 and would never wear a condom. Instead, Harris bought H.S. the "morning after pill." The state entered into evidence a receipt from Discount Drug Mart, dated September 12, 2014, that detailed the purchase of emergency contraceptive. The state also entered into evidence video surveillance from September 12, 2014, at the same Discount Drug Mart, that showed Harris making a purchase in the pharmacy.

{¶13} Veronique White, a Discount Drug Mart pharmacy technician, testified that Harris was a regular customer at the pharmacy. White stated that she personally sold

Harris the emergency contraceptive on two or three occasions, and that he told her that he was buying the pills for his daughter.

{¶14} According to H.S., Harris gave her these contraceptive pills "too many times to count"; in fact, at one point Harris told H.S. that she needed to go on birth control because he was "tired" of buying her the expensive pills. H.S. told Harris that she did not want to go on birth control because she wanted to date only girls and wanted him to stop.

{¶15} H.S. testified she was scared to tell anyone about Harris. At one point, she asked E.S. what he would do if she told him that someone was hurting her. Both H.S. and E.S. testified that E.S. got angry and told H.S. that he would "kill" anyone who hurt her. Because of this response, H.S. decided not to tell her brother about Harris.

{¶16} H.S. finally told her girlfriend, C.R., about Harris. H.S. called C.R. after one instance of abuse. C.R. heard H.S. crying on the phone and H.S. confided in C.R. about what Harris had been doing to her. H.S. asked C.R. to keep the abuse a secret, but C.R.'s mother found out and C.R. and her mother reported the abuse to the police.

{¶17} Cleveland Police Detective Alan Strickler was assigned to the case. H.S. told the detective that the allegations were false and to throw the case out. H.S. testified that she was scared that if she divulged the abuse, E.S. would be placed in foster care.

{¶18} H.S. then confided in Harris's former girlfriend, Wilcox. Wilcox testified that H.S. texted her on October 15, 2014, and asked if she would make H.S. tell if someone was hurting her. Wilcox met with H.S. the next day. H.S. told Wilcox that

Harris was forcing her to have sex with him. Wilcox told H.S. that she needed to tell someone right away but H.S. said she did not want to go to the police because she was afraid of Harris. According to Wilcox, H.S. thought people would believe Harris over her and feared for her brother's future.

{¶19} Towards the end of December 2014, Harris and H.S. got into an argument over H.S.'s music. H.S. left the house and went to stay with her girlfriend, C.R., without telling Harris where she was going. H.S. called Wilcox and told her that she was finally ready to go to the police and file a report. Wilcox took H.S. to the police station.

{¶20} Detective Cindy Bazilius ("Detective Bazilius") interviewed H.S. Detective Bazilius testified that H.S. indicated that the abuse had been going on for several years. According to Detective Bazilius, when she interviews a child victim that has been subjected to frequent abuse, she will try to get the child to focus on a few detailed incidents, rather than trying to remember every single incident. During her interview, H.S. was able to relate specific incidents of abuse to specific years in school and other major life events, rather than specific dates.

{¶21} The police secured a search warrant for Harris's house. Detective Bazilius testified that she conducted the search with the knowledge that it was important to look for old towels and clothing in the home and particularly in Harris's bedroom, because H.S. had stated that Harris would often use towels and clothing to clean up after they had sex. Forensic testing conducted on a blue towel taken from the top of Harris's bedroom dresser contained seminal material with a DNA profile that matched Harris's. The

police also took Harris's bedding into evidence and forensic testing confirmed that the bedding contained DNA from both Harris and H.S.

{¶22} Cuyahoga County Department of Children and Family Services social worker Hope Gula ("Gula") interviewed H.S. Gula testified that in her experience as a social worker in the sex abuse unit, child sex abuse victims often delay disclosure of their abuse. Gula noted that it is common for children to be mistaken about the time elements of the abuse, especially when the abuse occurred frequently over a long period of time. Gula testified that while interviewing H.S., H.S. disclosed to her certain behaviors that Harris possessed that are typically known as "grooming behaviors" in which the level of sexual activity he subjected H.S. to was slowly increased. Gula explained that these activities were consistent with her experience with other victims of sexual abuse.

{¶23} The jury found Harris guilty on all counts and the sexual motivation specifications. The court convicted Harris of the repeat violent offender specifications, acquitted him of the sexually violent offender specifications, and sentenced him to a total of 11 years in prison.

{¶24} Harris now appeals, raising the following six assignments of error for our review:

> I. The trial court erred by denying appellant's motion to suppress evidence in violation of his fourth and fourteenth amendment rights to the United States Constitution and Article I, Section 14 of the Ohio Constitution.
>
> II. Appellant's constitutional rights were violated because social worker Gula was permitted to give expert testimony in violation of Evid.R. 702 and testimony that improperly bolstered H.S.'s credibility.

III. Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motion for acquittal.

IV. The convictions were against the manifest weight of the evidence.

V. Appellant's federal and state constitutional right to a speedy trial and due process were violated and his conviction should be vacated and dismissed.

VI. The trial court erred by granting the state's oral motion to amend counts 12 – 15 [of] the indictment after the close of the state's case in chief which deprived appellant of a fair trial and violated his due process rights.

## II. Law and Analysis

### A. Trial court did not err in denying motion to suppress

{¶25} In the first assignment of error, Harris contends that the trial court erred in denying his motion to suppress.

{¶26} This court reviews a decision on a suppression motion under a mixed standard of review. "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility." *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). The reviewing court must accept the trial court's findings of fact in ruling on a motion to suppress if the findings are supported by competent, credible evidence. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

{¶27} Harris argues that the seizure of the towel from his house was

unconstitutional because, although the term "towel" was included in the search warrant affidavit, the term was not included in the actual search warrant.

{¶28} R.C. 2933.24(A) provides that a search warrant "shall * * * particularly name or describe the property to be searched for and seized, the place to be searched, and the person to be searched." In determining whether a warrant is specific enough, courts have determined that the specificity required varies with the nature of the items to be seized. *State v. McGettrick*, 40 Ohio App.3d 25, 29, 531 N.E.2d 755 (8th Dist.1988). The key inquiry is whether the warrant could reasonably have described the items more precisely. *State v. Benner*, 40 Ohio St.3d 301, 307, 533 N.E.2d 701 (1988).

{¶29} In this case, the warrant stated that the following could be searched and seized:

> photographs of the interior and exterior of the premises and any objects therein, said premises being crime scene; any and all bedding including sheets, pillowcases and blankets; Vaseline; DVDs, VHS tapes and/or movies; Pain pills and/or packaging; any and all biological and/or forensic material and/or items that might have such materials including that visible only by an alternate light source; and any and other evidence tending to establish violation of the criminal laws of the State of Ohio, including but not limited to: Rape, R.C. 2907.02.

{¶30} Detective Bazilius testified that when she executed the search warrant, she was looking for any towels that could contain evidence of Harris's DNA. She further

testified that H.S. had previously disclosed that Harris would use a towel to clean up after ejaculating on the floor when he abused her. Thus, the detective was aware that there may be a towel in Harris's house that had biological fluids on it that would connect him to the rape allegations. The warrant specifically stated that police would search for "items that might have" "biological and/or forensic material" "and any and other evidence tending to establish" "[r]ape." Clearly, the seized towel falls under the purview of the search warrant as it was an item that could contain biological and/or forensic material or could be other evidence tending to establish the crime of rape. We do not find that the omission of the specific word "towel" sanctioned an impermissible general exploratory search in this case.

{¶31} The common pleas court case Harris relies on, *State v. Simpson*, 64 Ohio Misc. 42, 412 N.E.2d 956 (C.P.1980), is easily distinguishable. In *Simpson,* the search warrant affidavit listed that officers were requesting to search Apts. 204 and 304. However, Apt. 304 was omitted from the command section of the warrant. Despite the omission, the officers searched both apartments. The court suppressed the items found in Apt. 304, reasoning that because Apt. 304 was missing from the command section, meant the executing court considered the request to search Apt. 304 and rejected the request. *Id.* at 43-44. In this case, there is no suggestion that the executing court rejected the request to seize towels, because it allowed the broader search and seizure of "any and all biological and/or forensic material and/or items that might have such material."

{¶32} In *Benner*, 40 Ohio St.3d 301, 533 N.E.2d 701, the Ohio Supreme Court upheld a search warrant that authorized a search of the defendant's houses and truck for "fibers and hairs and other trace evidence for comparison," but that did not specifically identify the items to be seized. The court found that the "fibers and hairs" language used in the warrant "placed a meaningful restriction on the executing officers, viz., they could only seize those items that could be sources of fibers and hairs." *Id.* at 307. "While the 'fibers and hairs' clause in the warrants was undoubtedly broad, we believe that it did not permit the officers to simply take any item they wanted." *Id.*

{¶33} Likewise, in this case, the language used in the warrant, while broad, still identified many items with particularity and did not permit the officers to take any item they wanted from Harris's house.

{¶34} In light of the above, the trial court did not err in denying Harris's motion to suppress.

{¶35} The first assignment of error is overruled.

**B. Social worker's testimony did not violate Evid.R. 702**

{¶36} In the second assignment of error, Harris contends that the social worker's testimony was in contravention of Evid.R. 702.

{¶37} During trial and on appeal, Harris raised several objections to social worker Gula's testimony, specifically as it related to: (1) children who recant sexual abuse allegations; (2) delayed disclosure of sexual abuse; (3) grooming behavior; (4) absence of physical injuries in cases of sexual abuse; and (5) H.S.'s credibility.

{¶38} "The determination of the admissibility of expert testimony is within the discretion of the trial court." *State v. Cook*, 11th Dist. Lake No. 2016-L-079, 2017-Ohio-7953, ¶ 40, citing Evid.R. 104(A). Such decisions will not be disturbed absent abuse of discretion. An abuse of discretion suggests unreasonableness, arbitrariness, or unconscionability. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993).

{¶39} Evid.R. 702 provides that "a witness may testify as an expert" if the witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; and his or her testimony is based on reliable scientific, technical, or other specialized information.

{¶40} The Ohio Supreme Court has held that professional experience and training in a particular field may be sufficient to qualify one as an expert. *State v. Hughes*, 10th Dist. Franklin No. 14AP-360, 2015-Ohio-151, ¶ 63, citing *State v. Mack*, 73 Ohio St.3d 502, 511, 653 N.E.2d 329 (1995). In *State v. Stowers*, 81 Ohio St.3d 260, 261, 690 N.E.2d 881 (1998), the Ohio Supreme Court held that "'an expert witness' testimony that the behavior of an alleged child victim of sexual abuse is consistent with behavior observed in sexually abused children is admissible under the Ohio Rules of Evidence."

The *Stowers* court found that the expert possessed specialized knowledge of the kind recognized under Evid. R. 702 that the average person lacks about behavioral characteristics of minor victims of sexual abuse through that expert's psychological training and professional experience:

> Most jurors would not be aware, in their everyday experiences, of how sexually abused children might respond to abuse. Incest is prohibited in all or almost all cultures and the common experience of a juror may represent a less-than-adequate foundation for assessing whether a child has been sexually abused.

*Stowers* at 262, quoting *State v. Boston*, 46 Ohio St.3d 108, 128, 545 N.E.2d 1220 (1989).

**{¶41}** In this case, the trial court determined that Gula qualified as an expert witness in the area of child sex abuse. Gula testified she has a master's degree in social work, has worked for the Cuyahoga County Department of Children and Family Services for over 18 years in the sex abuse department, and has received specialized training in the area of children who have suffered sex abuse. This testimony was sufficient for the trial court to declare Gula an expert under Evid.R. 702.

**{¶42}** Harris contends that Gula improperly vouched and unfairly bolstered H.S.'s otherwise inconsistent testimony and vouched for H.S.; in other words, according to Harris, Gula told the jury that what H.S. said was true. We disagree.

**{¶43}** Gula testified that she "did not have any concerns" with H.S. being "untruthful" with her, that H.S. disclosed information to her that "is a grooming kind of activity," and that typically a child abuser is someone that is known to the child. None of these statements rise to the level of reversible error.

**{¶44}** In *Boston*, the Ohio Supreme Court held that it was more than harmless error to allow an expert witness to testify as to the veracity of the child victim's statements. *Id.* at 129. In other words, it is impermissible for an expert witness to offer his or her opinion as to the truth of a child's statements. What is not prohibited, however, is testimony "which is additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity." (Emphasis sic.) *Stowers* at 263.

**{¶45}** In *Boston*, the child victim did not testify. In *Stowers,* as in this case, the child victim testified and was subject to cross-examination. As such, the trier of fact was able to ascertain the credibility of the victim. *See State v. Benjamin*, 8th Dist. Cuyahoga No. 87364, 2006-Ohio-5330 (distinguishing *Boston* and finding harmless error when child victim testifies and is subject to cross-examination).

**{¶46}** Therefore, the trial court did not abuse its discretion by qualifying Gula as an expert or in admitting her testimony. The second assignment of error is overruled.

## C. Sufficiency and manifest weight of the evidence

**{¶47}** In the third and fourth assignments of error, Harris argues that his convictions were not supported by the evidence and were against the manifest weight of the evidence.

**{¶48}** A sufficiency-of-the-evidence challenge questions whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380,

387, 678 N.E.2d 541 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1992), paragraph two of the syllabus.

{¶49} When a conviction is challenged as being against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at *id.* In a manifest-weight analysis, the credibility of the witnesses and the weight to be given to their testimony are primarily for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

> Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that a substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witnesses.

*State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709, 5 (Aug. 22, 1997).

{¶50} The evidence presented in this case supports a finding that Harris engaged in

vaginal intercourse with H.S. as charged in Counts 1 – 3, which meets the elements of the offense of rape as defined in R.C. 2907.02(A)(1)(b), sexual battery as defined in R.C. 2907.03, and kidnapping as defined in R.C. 2905.01. The date of the offense was September 11, 2014. Although H.S. did not testify that she was raped on the specific date of September 11, 2014, she testified that she was sexually assaulted by Harris numerous times and Harris would buy emergency contraception from the drugstore the day after he had unprotected sex with her. The state introduced evidence that Harris bought emergency contraception, or the "morning-after pill," from Discount Drug Mart on September 12, 2014.

{¶51} The evidence also supports a finding that Harris committed rape as charged in Count 9 of the indictment. Harris argues that the evidence did not support the conviction because the indictment stated that the date was between September 1, 2012, and May 30, 2013, and H.S. testified that she believed that this event occurred in the fall of 2014, right after Harris and Wilcox ended their relationship. But other evidence showed that Harris and Wilcox ended their relationship in the fall of 2012. H.S. testified that this incident of rape occurred right after the couple broke up; she associated the incidence with that timeframe. While H.S. testified as to the wrong year, the social worker testified that (1) child sex abuse victims are often mistaken about the time elements of the abuse, especially when the abuse has occurred frequently over a long period of time and (2) child sex abuse victims will often associate incidents with landmark events that occurred around the same time rather than remember specific dates.

Based on this, we find sufficient evidence to support a conviction on Count 9.

**{¶52}** The evidence also supports convictions for Count 16, gross sexual imposition as defined in R.C. 2907.05(A)(4); Counts 17 and 23, kidnapping; Count 21, rape; and Count 22, sexual battery. Counts 16 and 17 related to an incident that H.S. testified about where Harris assaulted her on the couch. Counts 21 – 23 related to an incident that occurred in the fall of 2014. H.S. testified specifically as to this incident and that it was one of the last times that Harris raped her.

**{¶53}** Harris claims that the record does not support his convictions because E.S. never saw Harris abuse H.S., Wilcox never noticed any inappropriate behavior, and H.S. delayed in reporting the abuse. None of these assertions, however, mean that there was insufficient evidence to support his convictions. Nor does it mean that a reasonable trier of fact lost its way in finding that Harris was guilty beyond a reasonable doubt. H.S. testified that E.S. was often not home when the abuse occurred and H.S. explained why she delayed disclosing the abuse; she was trying to protect her brother and she did not think anyone would believe her word over Harris's. Social worker Gula, an expert in child sex abuse, explained why children often delay in reporting their abuse.

**{¶54}** Harris further argues that H.S. fabricated the allegations in retaliation for wanting to be emancipated, because Harris filed a missing persons report on her, and because he would not let her attend a party. H.S.'s credibility, however, is a judgment that was left to the trier of fact, who clearly believed H.S.

**{¶55}** Harris also asserts that there is no forensic or DNA evidence that

substantiates the charges, arguing that H.S.'s DNA in Harris's bedroom on his bedding is only indicative that H.S. lived in the same house and that Harris's DNA found on the blue towel is unremarkable. We disagree. This evidence does not go against H.S.'s allegations; the discovery of H.S.'s DNA in Harris's bedroom and his seminal fluid on the blue towel is consistent with the facts H.S. testified to at trial.

{¶56} Having reviewed the record, and deferring to the jurors' decisions regarding whether and to what extent to credit the testimony of the witnesses, we conclude that the evidence is sufficient to support Harris's convictions and the convictions are not against the manifest weight of the evidence.

{¶57} Therefore, the third and fourth assignments of error are overruled.

## D. Harris's speedy trial rights not violated

{¶58} In the fifth assignment of error, Harris contends his speedy trial rights were violated.

{¶59} As an initial matter, we note that Harris filed a pro se motion to dismiss on speedy trial grounds. The record reflects that Harris was represented by counsel when he filed his pro se motion. Hybrid representation is not allowed; therefore, the trial court was unable to consider his motion. *State v. Davis*, 8th Dist. Cuyahoga No. 105129, 2017-Ohio-8479, ¶ 18 (a defendant has the right to counsel or the right to act pro se; however, a defendant does not have the right to both, simultaneously). Thus, Harris's failure to properly file a motion to dismiss on speedy trial grounds prior to trial and pursuant to R.C. 2945.73(B) prevents him from raising the issue on appeal. *State v.*

*Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 37; *State v. Simms*, 10th Dist. Franklin Nos. 05-AP-806 and 05AP-807, 2006-Ohio-2960, ¶ 10 (by not raising his speedy-trial claim in the trial court, "appellant waived all but plain error on his statutory claims").

**{¶60}** Moreover, Harris does not allege plain error on appeal; thus, we need not consider his argument even for plain error. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 17-20 (appellate court need not consider plain error where appellant fails to timely raise plain-error claim); *Wright v. Ohio Dept. of Jobs & Family Servs.*, 9th Dist. Lorain No. 12CA010264, 2013-Ohio-2260, ¶ 22 (when a claim is forfeited on appeal and the appellant does not raise plain error, the appellate court will not create an argument on the appellant's behalf).

**{¶61}** Assuming, however, the speedy trial issue was properly before us, Harris's argument would still fail. R.C. 2945.71(C) requires the state to bring a felony defendant to trial within 270 days of arrest. Each day during which the accused is held in jail in lieu of bail on the pending charge is counted as three pursuant to the triple-count provision of R.C. 2945.71(E). This "triple-count" provision reduces to 90 days the time for bringing to trial an accused who is incarcerated the entire time preceding trial. *State v. Dankworth*, 172 Ohio App.3d 159, 2007-Ohio-2588, 873 N.E.2d 902, ¶ 31 (2d Dist.). Pursuant to R.C. 2945.72, however, the time within which an accused must be brought to trial is extended by a period of delay caused by the accused's own motions.

**{¶62}** To the extent Harris argues that his statutory right to a speedy trial was

violated pursuant to R.C. 2945.71, the record establishes the following: Harris was arrested on January 20, 2015; therefore, speedy trial time started on January 21, 2015, with the time running three for one until he posted bond the next day, for a total of six speedy trial days. After he posted bond, time ran one for one until April 6, 2015, for a total of 81 speedy trial days.

{¶63} On April 6, 2015, Harris filed a demand for discovery, tolling time until April 14, 2015, when the state filed its response and demand for discovery. Time then resumed running until the first pretrial date, set for April 20, 2015, for a total of 87 speedy trial days. On April 20, 2015, the first pretrial was held and continued at Harris's request, tolling time until May 5, 2015. Successive pretrials were held and continued at Harris's request, tolling time until his first trial was held on April 5, 2016.

{¶64} R.C. 2945.71 only applies to the initial adjudication following arrest, not to subsequent trials after a jury fails to reach a verdict. *State v. Hull*, 110 Ohio St.3d 183, 2006-Ohio-4252, 852 N.E.2d 706, ¶ 14, citing *State v. Fanning*, 1 Ohio St.3d 19, 21, 437 N.E.2d 583 (1982). Instead of R.C. 2945.71, the standard to apply is reasonableness under federal and state constitutions. *Fanning* at *id.*

{¶65} Harris also raises a constitutional challenge with respect to his right to speedy trial. Again, Harris did not properly raise this issue below, but even if he had, we find no constitutional speedy-trial violation.

{¶66} The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to a speedy trial. The Due Process Clause of

the Fourteenth Amendment makes this provision applicable to the states. *Klopfer v. North Carolina*, 386 U.S. 213, 222-223, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). Furthermore, Section 10, Article I of the Ohio Constitution guarantees a criminal defendant the right to a speedy trial. In regard to the Sixth Amendment right to a speedy trial, the United States Supreme Court has stated:

> The Sixth Amendment right to a speedy trial is * * * not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*United States v. MacDonald*, 456 U.S. 1, 8, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982). *See also State v. Triplett*, 78 Ohio St.3d 566, 568, 679 N.E.2d 290 (1997).

{¶67} To determine whether an accused has been denied his or her constitutional right to a speedy trial, a court must consider the following four factors: (1) the length of the delay, (2) the reason for the delay, (3) the accused's assertion of his or her right to a speedy trial, and (4) the prejudice to the accused as a result of the delay. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Triplett* at *id.* None of these four factors are determinative of whether an accused suffered a violation of his

constitutional right to a speedy trial; rather, the court must consider the four factors collectively. *Barker* at 533.

**{¶68}** In this case, Harris contends that the six-month delay between his first trial resulting in a hung jury and the commencement of his second trial, from April 13, 2016, through October 24, 2016, was an unreasonable amount of time, and thus violated his constitutional rights to a speedy trial. We disagree and note that the six-month delay was largely a result of Harris's actions. The second trial was originally set for May 2016; however, pretrials were continued twice in May, at Harris's request. The trial was rescheduled to begin August 1, 2016, but Harris filed a motion for continuance on July 15. The court granted the motion and set a new trial date for October 24, 2016. Because we find the length of the delay was not prejudicial, we need not inquire into the other *Barker* factors.

**{¶69}** Having found no merit to Harris's constitutional and statutory speedy-trial challenges, his fifth assignment of error is overruled.

## E.   No error in amending indictment

**{¶70}** In the sixth assignment of error, Harris contends that allowing the state to amend the dates on the indictment violates his due process rights.

**{¶71}** Crim.R. 7(D) provides:

> The court may at any time before, during, or after a trial amend the indictment * * * in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged. If any amendment is made to the substance of the indictment * * * or to cure a variance between the indictment * * * the defendant is entitled to a discharge of the jury on

the defendant's motion, if a jury has been impaneled, and to a reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later day with the same or another jury.

{¶72} Thus, pursuant to Crim.R. 7(D), the court may amend the indictment to conform to the evidence. Here, after the close of the state's case, the state moved to amend the dates of Counts 12 – 17 to conform with the evidence presented in the case.

{¶73} Harris claims he was prejudiced by the amended indictments, but he does not support his contention with any arguments as to *how* he was prejudiced. Specific dates and times are not elements of the offenses upon which he was indicted. *See State v. Rogers*, 12th Dist. Butler No. CA2006-03-055, 2007-Ohio-1890, ¶ 26. Moreover, Harris's defense centered upon his denial that the acts in question ever occurred, regardless of when the acts were alleged to have occurred. Put another way, Harris's defense to the allegations of sex abuse were that the allegations were entirely false; we do not see how changing the date range during which the abuse occurred would affect his defense. Thus, Harris has failed to demonstrate how amending the dates on some counts of the indictment prejudiced him.

{¶74} Harris has failed to demonstrate he was prejudiced by the amendment of the indictment; therefore, the sixth and final assignment of error is overruled.

{¶75} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., JUDGE

KATHLEEN ANN KEOUGH, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR