[Cite as *State v. Bright*, 2024-Ohio-2803.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 112799 |
| v. | : | |
| RICKEY M. BRIGHT, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED AND REMANDED
**RELEASED AND JOURNALIZED:** July 25, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-670918-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Michael Lisk, Assistant Prosecuting Attorney, *for appellee*.

The Goldberg Law Firm, LLC, Michael J. Goldberg, and Adam Parker, *for appellant*.

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Rickey Bright ("Bright"), appeals his convictions for one count of rape of a child under the age of ten, two counts of gross sexual imposition, two counts of child endangering, one count of public indecency,

and one count of domestic violence. The trial court sentenced Bright to 25 years to life in prison. Bright now appeals. For the reasons set forth below, we affirm his convictions, but remand to the trial court for the sole purpose of correcting the sentencing entry.

## I. Facts and Procedural History

{¶ 2} In June 2022, Bright was charged in a ten-count indictment that included two counts of rape of a victim under the age of ten; two counts of gross sexual imposition; two counts of endangering children; one count of pandering; one count of disseminating matter harmful to juveniles; one count of public indecency; and one count of domestic violence. The charges arose from allegations by Bright's two minor daughters, K.B. and N.B., who reported that while staying at their dad's apartment on May 19, 2022, Bright had vaginal sex with K.B., and forced K.B. to perform oral sex on him. In addition, K.B. and N.B. alleged that Bright grabbed both of their buttocks. Then, Bright assaulted their mother ("Mom") when she confronted him about the allegations.

{¶ 3} In October 2022, the matter proceeded to jury trial. K.B. testified that she was eight years old, she lived with her mother and sister, and they had just moved back from California. She testified that her dad's name was Rick, but she would not identify Bright in the courtroom. She stated that the last time she saw her dad she was seven years old, and that this made her sad and she missed him. K.B. testified that she still loved him. At first, K.B. denied that anything happened with Bright but eventually acknowledged that she woke up in the morning and had

to brush her teeth "[b]ecause the icky stuff was in my mouth." (Tr. 296.) She testified that it came from Bright's "private part" and that he rubbed it all over her face and it dripped in her mouth. (Tr. 297.) When asked if he put it in her mouth she replied, "[y]eah." (Tr. 297.) She testified that her toothbrush was orange. She also referred to her dad's "private parts" as his "peanuts," and the "icky stuff" as "gooey stuff." (Tr. 296 and 298.) K.B. denied anything else happened.

{¶ 4} N.B. testified that she was twelve years old at the time of trial, and that she lived with her mother and sister, K.B., and that they had just moved back from California. N.B. testified that when the incident happened, she was at her dad's house with her sister. She testified that it happened in the bedroom, that the three of them were on the bed together and that she was "halfway asleep, and I heard [K.B.] saying, 'stop' and [Bright] was pulling her up. . . . [to] his private part." (Tr. 307.) N.B. testified that her dad made K.B. swallow, "white stuff," that came out of her dad's "private part," and K.B. was sitting down when it occurred. (Tr. 315-316.) N.B. testified that she fell back to sleep. She testified that her dad squeezed her buttocks and she felt uncomfortable. N.B. would not identify Bright in the courtroom.

{¶ 5} The girls' mother testified that she had been in a relationship with Bright since 2007 and that they married in 2017. She testified that Bright is both girls' father and identified him in the courtroom. She stated that they started living separately in 2019, but the girls would often stay with Bright. On May 19, 2022, the girls were staying with Bright at his apartment on Bosworth Avenue in

Cleveland, Ohio. Mom testified that when they returned home Bright stayed the night, and in the morning, when Bright was sleeping, K.B. told her "'[m]ommy, daddy told me to do it like this.' She didn't — she's young. She does not know the terms, but she's using hand gestures."[1] (Tr. 339.) Mom said that she was shocked and that "[K.B.] should know nothing about that." (Tr. 339.) She testified that she knew K.B. was not lying because "that's exactly how he likes it." (Tr. 339.) Mom testified that she called her mother and then she called the police. She stated that she confronted Bright who said the girls were lying and then Bright started hitting her. Mom said that he hit her in the face and the ear. The police arrived and then she took the girls to the hospital to be examined and then to the child-advocacy center to be interviewed.

{¶ 6} The sexual assault nurse examiner ("SANE nurse") from University Hospitals Rainbow Babies and Children's Hospital that examined both girls testified. She read into the record the "Assault Narrative" provided by each girl on the date of their exams. (State's exhibit Nos. 3 and 4.) K.B.'s narrative asserted that her dad made her "suck" and "touch" his penis; that nothing came out; that she was sleeping at the time it happened; that she sleeps with her mouth open; and that her sister told her what happened. (State's exhibit No. 3.) N.B.'s narrative alleged that her dad "touched my bottom but he did way more bad stuff to my sister." N.B. stated, "I was fake sleeping and he, my dad, rubbed his 'private part'

---

[1] Although Mom demonstrated the hand gesture for the jury, the gesture is not described for the record.

on [my] sister's face and he was forcing her — he put his 'private part' in [my] sister's private part.  She was telling him to stop but my dad is strong[.]"  (State's exhibit No. 4.)

{¶ 7}  The social worker from Cuyahoga County Division of Children and Family Services that conducted the forensic interviews of both girls testified.  The interviews were played for the jury.  (State's exhibit Nos. 7 and 8.)

{¶ 8}  In K.B.'s interview, she told the social worker that she and her sister were sleeping at their dad's house when their dad "made me suck his 'peanuts'. . . . He made me put my hand on his 'peanuts', and he picked up his 'peanuts' and rubbed it all over my face."  (State's exhibit No. 7.)  K.B. told the social worker that "he put it [peanuts] in my mouth and he was holding my. nose."  K.B. said that she was asleep, that her sister observed what happened and told her.  K.B. stated that she woke up with "nasty stuff" in her mouth.  She stated that she rinsed her mouth out with mouthwash.  K.B. stated that her dad squeezed her "bottom" over her clothes.  She also described Bright's penis in the interview.  On an anatomical drawing of a male and female, K.B. identified "peanuts" as the male penis, and K.B. circled all the locations where she was touched, including her hand, face, mouth, and vagina.  (State's exhibit No. 5.)

{¶ 9}  In N.B.'s interview, she told the social worker that she, her sister, and their dad slept in the same bed and "I faked like I was asleep, and my dad did horrible stuff to my sister. . . .  I just wanted to see what he was going to be doing but I found out he was doing bad stuff to my sister."  (State's exhibit No. 8.)  N.B.

said she observed her dad rubbing his "private part" on her sister's face and "forcing my sister to do stuff." N.B. said her sister was awake and K.B. told her dad to "stop." N.B. said she observed her dad put his "peanuts" in [K.B.'s] mouth and in her "private part." N.B. said K.B. was sitting when this happened. N.B. said she fell asleep and then her dad touched N.B.'s "bottom" over her clothes. (State's exhibit No. 8.)

{¶ 10} The forensic DNA analyst from Cuyahoga County Regional Forensic Science Laboratory testified as an expert witness ("DNA expert"). She testified that K.B.'s pajamas and toothbrush were submitted for DNA testing. The results indicated that Bright's DNA matched a sperm fraction that was found on K.B.'s pajama shirt and toothbrush.

{¶ 11} Bright, who is 60 years old, testified on his own behalf and denied that any sexual conduct occurred. Bright's testimony implied that the girls' mom orchestrated these allegations because they were fighting about her bringing other men around the girls, and she wanted to move the girls to Arizona.

{¶ 12} The jury found Bright guilty of one count of rape of a child under the age of ten (fellatio), two counts of gross sexual imposition, two counts of child endangering, one count of public indecency, and one count of domestic violence. The trial court sentenced Bright to 25 years to life in prison. The sentencing judgment entry states that the court imposed a sentence of life with the possibility of parole after a minimum of 25 years and a maximum of 37.5 years on Count 1 pursuant to the Reagan Tokes Law.

{¶ 13} Bright appeals and raises the following assignments of error for review:

**Assignment of Error I:** Appellant received ineffective assistance of counsel, where trial counsel did not object to testimony offered in violation of Crim.R. 16(K), failed to raise the competency of an eight-year-old witness, and failed to object to improper statements of the prosecutor in closing argument.

**Assignment of Error II:** The trial court plainly erred by permitting expert testimony in violation of Crim.R. 16(K).

**Assignment of Error III:** The trial court plainly erred by failing to conduct a voir dire of K.B. to determine her competency to testify.

**Assignment of Error IV:** Cumulative error deprived appellant of a fair trial.

**Assignment of Error V:** Appellant's convictions are against the sufficiency of the evidence.

**Assignment of Error VI:** Appellant's convictions are against the manifest weight of the evidence.

**Assignment of Error VII:** The trial court erred in applying the Reagan Tokes law to a life sentence.

## II. Law and Analysis

{¶ 14} The first three assignments of error will be addressed together because the arguments and law are intertwined. Under these assignments of error, Bright maintains that his defense counsel was ineffective for three reasons: (1) he failed to object to the expert testimony of the SANE nurse, the social worker, and the DNA analyst; (2) he failed to challenge the competency of K.B.; and (3) he failed to object to improper comments made during the State's closing argument. Bright also argues that the court committed plain error when it allowed the SANE nurse, the

social worker, and the DNA analyst to provide expert testimony.  Additionally, he alleges that the trial court committed plain error when it failed to conduct a competency hearing of K.B.

## A.  Standard of Review – Ineffective Assistant of Counsel and Plain Error

{¶ 15} To establish ineffective assistance of counsel, appellant must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial.  *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 687, (1984).  The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong.  *State v. Madrigal*, 2000-Ohio-448, citing *Strickland* at 697; *State v. Giguere*, 2023-Ohio-4649, ¶ 28 (8th Dist.).

{¶ 16} "'The failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.'" *State v. Dix*, 2023-Ohio-4123, ¶ 32 (8th Dist.), quoting *State v. Holloway*, 38 Ohio St.3d 239, 244 (1988).  However, the failure to object waives all but plain error.  Crim.R. 52(B); *State v. Rogers*, 2015-Ohio-2459, ¶ 28.

{¶ 17} To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial.  *State v. Pratts*, 2016-Ohio-8053, ¶ 34 (8th Dist.), citing *State v. Barnes*, 2002-Ohio-68.  As the Supreme Court clarified in *Rogers*, the accused is "required to demonstrate a reasonable probability that the

error resulted in prejudice — the same deferential standard for reviewing ineffective assistance of counsel claims." *Id*. at ¶ 22, citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81-83, (2004); *State v. Thomas*, 2017-Ohio-8011, ¶ 33. Nevertheless, even if the plain-error standard is met, courts should only notice it "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio 2d. 91 (1978), at paragraph three of the syllabus.

### B. Expert Testimony Verses Lay Testimony

### 1. The SANE Nurse's Testimony

{¶ 18} Bright argues that the SANE nurse improperly provided expert testimony without being qualified as an expert or providing an expert report in accordance with Crim.R. 16(K), which requires exclusion of expert testimony if an expert report is not provided 21 days prior to trial. *State v. Boaston*, 2020-Ohio-1061, ¶ 55. Specifically, Bright complains that the SANE nurse offered opinions as to the typical manner of disclosure of child sexual-assault victims — how, when, and why they may or may not disclose. He contends that defense counsel was ineffective when he did not object to this testimony and the trial court committed plain error by allowing the testimony, because it bolstered K.B. and N.B.'s credibility. In support of his argument, Bright relies on *State v. McGhee*, 2017-Ohio-5773 (11th Dist.) and *State v. Harris*, 2018-Ohio-578 (8th Dist.). Bright's reliance, however, on *McGhee* and *Harris* is misplaced.

{¶ 19} In *McGhee*, the issue involved a non-treating physician's expert testimony regarding delayed disclosures and lack of physical findings in sexual assaults. The State provided an expert report a few days before the trial. The Eleventh District held that the expert's testimony should have been excluded in accordance with Crim.R. 16(K) because it was not provided 21 days before trial, stating that "[t]he purpose of Crim.R. 16(K) is to prevent surprise, trial by ambush." *McGhee* at ¶ 19-21.

{¶ 20} In *Harris*, the appellant complained that the social worker, who was qualified as an expert, improperly vouched for and unfairly bolstered the child-victim's testimony when the social worker testified that she "did not have any concerns" with the victim being "untruthful" and that the victim disclosed information that was "a grooming kind of activity," and that a child abuser is typically someone the child knows. This court held that although it is impermissible for an expert witness to offer her opinion as to the truth of the child's statements, it is permissible for testimony, "which is additional support for the truth of the facts testified to by the child, which assists the fact finder in assessing the child's veracity." *Harris* at ¶ 42-43. We noted that the child victim testified and was subject to cross-examination and concluded that the trier of fact was able to ascertain the credibility of the victim, and that the court did not abuse its discretion by qualifying the social worker as an expert and admitting her testimony. *Id.* at ¶ 44.

{¶ 21} The State argues that the SANE nurse testified as a lay witness in accordance with Evid.R. 701, which provides that "if the witness is not testifying as

an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Therefore, the State contends that an expert report was not required under Crim.R. 16(K).

{¶ 22} In support of its argument, the State relies on *State v. Belle*, 2019-Ohio-787 (8th Dist.). In *Belle*, the appellant argued that the SANE nurse testified as an "expert" regarding the effect of trauma on a victim's memory without being qualified as an expert. This court disagreed, noting that before asking her questions about trauma and memory, the prosecutor elicited information about her training and experience regarding the "neurobiology of trauma," the effect of trauma on the brain, and how she had seen that manifest in sexual-assault victims. *Id.* at ¶ 40-41. We concluded that the SANE nurse's testimony was permissible lay-witness testimony because "[t]he state had laid a foundation demonstrating that she had a sufficient amount of experience and training and her testimony here was based on her personal knowledge and experience." *Id.* at ¶ 48.

{¶ 23} In the instant case, the testimony was elicited from the examining SANE nurse who explained to the jury, based on her experience, that there are several reasons why a child may not want to disclose abuse, including fear that they may get in trouble, not having the words to describe what happened to them, lack of understanding that what happened was wrong, or fear of not being believed. She testified that children may not disclose for days, weeks, or months after the abuse

happens. Lastly, she testified that children often disclose the least invasive act first, and once they feel safe sharing, disclose further information. This testimony was general in nature and not pertaining to K.B. or N.B. specifically.

{¶ 24} In addition, prior to this testimony, the SANE nurse detailed her education and credentials, including that she is the pediatric forensic program coordinator at University Hospitals Rainbow Babies and Children's Hospital; she has been trained as a SANE nurse for over 12 years; she has performed nearly 1,000 exams; and she has trained many nurses and physicians over the years on how to perform forensic sexual-assault exams.

{¶ 25} We find that this case is similar to *Belle* and conclude that the SANE nurse's testimony was permissible lay-witness testimony because the State laid a foundation demonstrating that the SANE nurse had sufficient experience and training, and that her testimony was based on her personal knowledge and experience. Because the SANE nurse's testimony was properly admitted, Crim.R. 16(K) was not violated; counsel's failure to object was not deficient performance; and the trial court did not commit plain error by allowing the testimony.

## 2. The Social Worker's Testimony

{¶ 26} Bright argues that the social worker also provided expert testimony without supplying an expert report in violation of Crim.R. 16(K). He specifically complains that the social worker testified regarding "active" and "inactive" stages of disclosure, and how in the "active" stage, children will disclose abuse, but in the

"inactive" stage they may recant their prior disclosure. The social worker testified that the children were in the "active" stage when she met with them. (Tr. 390-391.) Bright argues that his defense counsel should have objected to this testimony, and it was plain error for the court to allow the testimony. The State contends that it was permissible lay-witness testimony. Again, we must first determine whether the social worker provided lay or expert testimony before we determine if Crim.R. 16(K) was violated.

{¶ 27} In a similar case, *State v. Mathis*, 2019-Ohio-3654 (8th Dist.), the defendant argued that the sex-abuse social worker improperly provided expert testimony regarding the manner in which sexually abused children disclose their abuse, and that the testimony was improperly used to bolster the victim's testimony. This court noted that before offering her opinion, the social worker briefly summarized her education and credentials, which included specialized sexual-abuse training in interviewing children, 22 years in the sexual-abuse department and investigation into approximately 2,000 cases. This court found that the social worker's testimony "that it is 'pretty common' for sexually abused children to disclose the abuse in a 'long-term disclosure'" was based on her firsthand experience and helpful to determine a fact at issue in the case, and thus permissible lay-witness testimony. *Id.* at ¶ 63, *see also State v. Sellers*, 2022-Ohio-581 (11th Dist.), (concluding that testimony by a social worker "about the manner in which sexually abused children disclose the nature of their abuse based on her experience with such cases," is admissible lay opinion testimony.), *Id.* at ¶ 31, quoting *Mathis* at ¶ 61-63.

{¶ 28} Here, prior to the testimony complained of, the social worker testified that she was a sex abuse intake worker for Cuyahoga County Division of Children and Family Services for six years and had been trained in forensic interviewing of alleged child victims. She testified that she has investigated hundreds of sex-abuse cases and interviewed hundreds of alleged child victims.

{¶ 29} Likewise, we find that the social worker's testimony was permissible lay-witness testimony because the State laid a foundation demonstrating that she had sufficient experience and training and that her testimony was based on her personal knowledge and experience. Because the social worker's testimony was properly admitted lay-witness testimony, Crim.R. 16(K) was not violated; counsel's failure to object was not deficient performance; and the trial court did not commit plain error by allowing the testimony.

### 3. The DNA Expert's Testimony

{¶ 30} Bright argues that although the DNA analyst was qualified as an expert and Bright was provided with the DNA reports (State's exhibit Nos. 1 and 2), the expert testified outside the scope of her report when she explained the process of "differential extraction" because this process was not specifically addressed in her report. As a result, Bright contends that defense counsel was deficient when he failed to object to this testimony, and the court committed plain error when it allowed the testimony. We find Bright's arguments unpersuasive.

{¶ 31} Here, Bright was provided with two DNA reports, as well as the forensic DNA expert's Curriculum Vitae, prior to trial in accordance with

Crim.R. 16(K)'s 21 day requirement. The reports set forth the items tested for the presence of DNA and the results of the DNA testing. (State's exhibit Nos. 1 and 2.) Crim.R. 16(K) governs expert witnesses and expert reports, and it states:

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 32} We note that Crim.R. 16(K) requires a written report *summarizing* an expert witness's testimony, findings, analysis, conclusions, or opinions, not a detailed itemization of the expert's testimony. Indeed, the purpose of Crim.R. 16(K) is to avoid unfair surprise by providing notice to the opposing side so the party has the opportunity to challenge the expert's findings, analysis, or qualifications. *Boaston*, 2020-Ohio-1061, ¶ 48.

{¶ 33} In *State v. Thompson,* 2021-Ohio-3184 (1st Dist.), the appellant argued that the trial court erred by allowing the Hamilton County Crime Lab drug analyst, who tested and identified the substances recovered from Thompson's person upon arrest, to present expert testimony without providing an adequate expert report. Thompson argued that the "cursory summary of data" contained in the one-paged "Official Crime Laboratory Report" that described the substances tested, the weight of each substance, and the identity of the substances should not be considered a Crim.R. 16(K) report. The First District Court disagreed finding that

the expert's opinion "was confined to describing and identifying the four substances she tested; her report reflects all of this information." *Id.* at ¶ 38. The court held that the one-page report complied with Crim.R. 16(K).

{¶ 34} Similarly, in this case, a review of the transcript and State's exhibit Nos. 1 and 2 reveals that the DNA expert's testimony was confined to describing the processes used to obtain the DNA results set forth in the reports provided. The expert explained "differential extraction" and testified that "everywhere we say 'epithelial fraction' or 'sperm fraction' [in the report], that means the item went through the 'differential extraction' [process]." (Tr. 411-412.) A review of the reports discloses that "epithelial fraction" and "sperm fraction" are listed multiple times throughout both reports, which we find is sufficient notice to the defense. This notice allowed the defense an opportunity to challenge the expert's findings, analysis, or qualifications, and the defense counsel in this case did cross-examine the DNA expert regarding the processes and the results. Therefore, we conclude that the DNA expert's testimony did not go beyond the scope of the DNA reports. She merely explained the process by which the results were obtained.

{¶ 35} Because the expert testimony was not beyond the scope of the DNA reports provided to defense, Crim.R. 16(K) was not violated; counsel's failure to object was not deficient performance; and the trial court did not commit plain error by allowing the testimony.

## C. Competency of a Witness

{¶ 36} Bright alleges that it was plain error for the trial court not to conduct a competency hearing before eight-year-old K.B testified, because she was clearly incompetent to testify. He also argues that he received ineffective assistance of counsel when his defense counsel failed to request a hearing on K.B.'s competency. The State argues that K.B. was competent to testify and the State conducted what amounted to a voir dire of K.B.'s competency at the beginning of her testimony.

{¶ 37} Evid. R. 601 requires that "[e]very person is competent to be a witness except as otherwise provided in these rules." Although prior versions of the rule contained a provision expressly dealing with children under ten years old, the current rule does not. *State v. Azali*, 2023-Ohio-4643, ¶ 11-13, (8th Dist.), citing *State v. Haywood*, 2023-Ohio-1121, ¶ 21 (7th Dist.).

{¶ 38} Nevertheless, R.C. 2317.01 states: "All persons are competent witnesses *except* those of unsound mind and *children under ten years of age* who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." (Emphasis added.) Because of this, the Supreme Court of Ohio has held that a "trial court must conduct a voir dire examination of a child under ten years of age to determine the child's competence to testify." *State v. Maxwell*, 2014-Ohio-1019, ¶ 100. In making its competency determination, the Supreme Court of Ohio has directed trial courts to consider the following factors:

(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify; (2) the child's ability to recollect those impressions or observations; (3) the child's ability to communicate what was observed; (4) the child's understanding of truth and falsity; and (5) the child's appreciation of his or her responsibility to be truthful.

*State v. Frazier*, 61 Ohio St.3d 247, 251-252 (1991).

{¶ 39} Although it is preferred for the trial court to conduct a competency hearing before allowing children under the age of ten to take the stand, it is not automatically plain error.[2] *State v. Crenshaw*, 2020-Ohio-4922, ¶ 61-62 (8th Dist.), *see also, Warrensville Hts. v. Thomas*, 2001 Ohio App. LEXIS 3724 (8th Dist. Aug. 1, 2001); *State v. Morgan*, 31 Ohio App.3d 152 (1st Dist. 1985).

{¶ 40} Both parties contend that *State v. Pridgett,* 2016-Ohio-687 (8th Dist.) supports their respective positions. In *Pridgett*, this court found no error when the child victim testified after the prosecutor and judge conducted what amounted to a voir dire of her competency at the beginning of her testimony. This court applied the *Frazier* factors to the child's testimony finding that "she was able to testify with great detail and clarity about how Pridgett touched her, using anatomically correct dolls. She was able to receive those impressions of fact and recollect them. She testified as to the difference between the truth and a lie, giving examples of both. She also testified that it was bad to lie, and that she was not allowed to lie thus, appreciating her responsibility to be truthful. She was able to

---

[2] Generally, appellate courts review a trial court's competency determination under an abuse of discretion standard. *State v. Grahek*, 2003-Ohio-2650, ¶ 22 (8th Dist.). However, because defense counsel failed to object, we review under the plain-error standard.

give a detailed description of her room, the items contained in the room, and even the lock on the door of her bedroom. [The child] was able to communicate and relate her understanding of the truth and falsity." *Id.* at ¶ 13.

{¶ 41} Here, before K.B. testified, the court swore her in and said:

THE COURT:  Do you know how to pinkie swear?  Do you know what to tell the truth is?

THE WITNESS:  Yeah.

THE COURT:  Can you pinkie swear with me you'll tell the truth, okay?

THE WITNESS:  Yes.

THE COURT:  Okay, thank you.  You may inquire.

(Tr. 291.)

{¶ 42} The State inquired as to her first and last name and K.B. provided a response to both.  Then the State asked where she lived.

THE WITNESS:  We live out here now, but I think tomorrow we are going to go back.

THE STATE:  Where is "Back"?

THE WITNESS:  Back to Arizona — no, back to California.

THE STATE:  California, okay.

THE STATE:  How old are you, [K.B.]?

THE WITNESS:  Eight.

THE STATE:  Eight?  When is your birthday?

THE WITNESS:  I don't know.

THE STATE:  You don't know?  Okay.  Have you met me before?

THE WITNESS:  (No verbal response.)

THE STATE:  Okay.  Is that a "Yes"?

THE WITNESS:  Yes.

THE STATE:  Yeah.  Do you remember my name?

THE WITNESS:  (No verbal response.)

THE STATE:  That's okay.  I'm Amanda, okay?  I've got some questions. [K.B.], what is your mommy's name?

THE WITNESS:  [Provides Mom's name]

THE STATE:  And what's your daddy's name?

THE WITNESS:  Rick.

THE STATE:  Rick?  That's your daddy's name?  And who do you live with now?

THE WITNESS:  My mom and my sister.

THE STATE:  Did you ever live with daddy?

THE WITNESS:  (No verbal response.)

THE STATE:  Yeah?

THE WITNESS:  Yeah.

THE STATE:  How long ago?

THE WITNESS:  I don't know.

THE STATE:  You don't know?

(Tr. 291-293.)

{¶ 43}  K.B. went on to say that the last time she was with her dad was when she was seven, it was warm outside, and she had just finished school.  She did not know the difference between a "good touch" or a "bad touch."  (Tr. 293.)  At first, she denied seeing her dad's "private part," the State then said, "I know this is hard, okay,

but you've got to tell the truth." (Tr. 295-296.)  K.B. did not respond.  Eventually, K.B. relayed some of what she originally reported to the SANE nurse, and the social worker.

{¶ 44} After reviewing K.B.'s testimony, we cannot say that K.B. was competent to testify.  Neither the State nor the court established the child's ability to receive accurate impressions of fact or to observe acts about which she would testify; the child's ability to recollect those impressions or observations; the child's ability to communicate what was observed; the child's understanding of truth and falsity; or the child's appreciation of her responsibility to be truthful.  Nevertheless, the inquiry does not end there, we must still decide if allowing K.B. to testify prejudiced Bright so as to deprive him of a fair trial.

{¶ 45} In this case, K.B.'s statements to the SANE nurse were read into the record, and K.B.'s interview with the social worker was played for the jury.  (State's exhibit Nos. 3 and 7.)  Both statements gave a detailed account of K.B.'s accusations, far more detailed than her testimony.  Consequently, we cannot say that Bright was prejudiced by her testimony.  If anything, K.B.'s testimony helped Bright obtain an acquittal of the vaginal rape charge.  Because we find that Bright was not prejudiced by K.B.'s testimony, we cannot say defense counsel was ineffective or the trial court's error in not conducting a competency hearing rose to the level of plain error.

### D. Closing Argument

{¶ 46} Lastly, Bright argues that his defense counsel was ineffective for failing to object to the State's improper comment, "in this case, I would argue there

is no reasonable doubt. None has been presented to you." (Tr. 613.) Bright argues that this statement improperly implies that Bright bears the burden to prove reasonable doubt and in essence the State committed prosecutorial misconduct.

{¶ 47} Again, we note that "[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *Dix*, 2023-Ohio-4123, at ¶ 13 (8th Dist.), quoting *Holloway*, 38 Ohio St.3d at 244. Furthermore, a prosecutor has wide latitude in closing argument and is free to comment on what the evidence has shown and reasonable inferences that can be drawn from that evidence. *State v. Harris*, 2017-Ohio-2751, ¶ 84 (8th Dist.). However, a prosecutor must avoid any declarations, claims, or averments that are deliberately calculated to mislead a jury. *Parma v. Perotti*, 2024-Ohio-1359, ¶ 8 (8th Dist.), citing *State v. Maurer*, 15 Ohio St.3d 239 (1984). An allegation of prosecutorial misconduct in closing argument must be reviewed to determine whether any remarks were improper and, if so, whether they prejudicially affected Bright's substantial rights. A conviction can only be reversed on the grounds of prosecutorial misconduct if the effect of the misconduct permeated the entire trial and Bright has demonstrated that but for the prosecutor's improper statements, he would have prevailed at trial. *Broadview Hts. v. Thomas*, 2023-Ohio-4645 (8th Dist.).

{¶ 48} Here, the State's comment — "in this case, I would argue there is no reasonable doubt. None has been presented to you" — is arguably improper. However, the instructions on reasonable doubt and the State's burden of proof were read to the jury multiple times throughout trial. Further, when reviewing the

statement in the context of the whole trial, we cannot say that but for this improper statement Bright would have prevailed at trial. Therefore, the failure to object did not prejudice Bright.

{¶ 49} For the reasons set forth above, we conclude that Bright's defense counsel was not deficient, and the trial court did not commit plain error.

{¶ 50} Accordingly, Bright's first, second, and third assignments of error are overruled.

### E. Cumulative Error

{¶ 51} Under Bright's fourth assignment of error, he argues that if the errors complained of in the first three assignments of error, standing alone, do not call for reversal of his conviction, cumulatively, they deprived Bright of a fair trial. We disagree.

{¶ 52} Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Allen*, 2016-Ohio-102, ¶ 53, citing *State v. Garner*, 1995-Ohio-168. However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent. *Id.*; *State v. Brown*, 2003-Ohio-5059, ¶ 48. Because this court has found Bright's arguments with regard to his other assignments of error unpersuasive, the cumulative-error doctrine does not apply.

{¶ 53} Accordingly, Bright's fourth assignment of error is overruled.

## F. Sufficiency and Manifest Weight of the Evidence

{¶ 54} In his fifth and sixth assignments of error, Bright argues that K.B.'s testimony and statements made to the SANE nurse and the statements made to the social worker were inconsistent with each other and thus his convictions are against the sufficiency of the evidence and the manifest weight of the evidence. We disagree.

{¶ 55} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 56} With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 57} "While the test for sufficiency requires a determination of whether the prosecution has met its burden of production at trial, a manifest weight challenge questions whether the prosecution has met its burden of persuasion." *Bowden*, *supra*, citing *Thompkins, supra*. "When considering a manifest-weight claim, a

reviewing court must examine the entire record, weigh the evidence, and consider the credibility of witnesses." *Id.*, citing *State v. Thomas*, 70 Ohio St.2d 79, 80 (1982). The court may reverse the judgment of conviction if it appears that the factfinder "'"clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered."'" *Id.*, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, (1st Dist. 1983). A judgment should be reversed as against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, quoting *Martin*.

{¶ 58} "'Challenges to the sufficiency of the evidence based upon instances of inconsistent testimony, memory defects, and the like are witness credibility issues which are properly resolved by the trier of fact.'" *State v. Parke*, 2023-Ohio-1144, ¶ 16-17 (8th Dist.), quoting *State v. Nichols*, 2013-Ohio-3898, ¶ 13 (5th Dist.). Further, "[a] defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness' testimony are inconsistent or contradictory." *State v. Williams*, 2024-Ohio-838, ¶ 54 (8th Dist.), quoting *Flores-Santiago*, 2020-Ohio-1274, ¶ 40 (8th Dist.).[3] Finally, the jury may detect any number of

---

[3] *See also State v. Wade*, 2008-Ohio-4574, ¶ 38 (8th Dist.) ("'A conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony.'"), quoting *State v. Asberry*, 2005-Ohio-4547, ¶ 11 (10th Dist.); *State v. Mann*, 2011-Ohio-5286, ¶ 37 (10th Dist.) ("'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, . . . such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 1996 Ohio App. LEXIS 2245 (May 28, 1996, 10th Dist.).

inconsistencies and resolve them accordingly, "'believ[ing] all, part, or none of a witness's testimony.'" *State v. Brown*, 2019-Ohio-313, ¶ 21 (8th Dist.), quoting *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 59} Here, although K.B. and N.B.'s testimony and statements regarding who told who about the sexual abuse were inconsistent, both K.B. and N.B.'s testimony and statements describing the sexual conduct perpetrated on K.B. and N.B. by Bright were consistent. Both girls testified that Bright forced K.B. to "suck his peanuts" and touched both of their "bottoms." Further, a sperm fraction with Bright's DNA was found on the toothbrush that K.B. testified she used to get the "icky stuff" out of her mouth, as well as on K.B.'s pajama shirt, which corroborated their testimony.

{¶ 60} Therefore, we find that after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crimes charged. Furthermore, after reviewing the entire record, weighing all the evidence, and considering the credibility of witnesses, we cannot say that the jury clearly lost its way; thus, Bright's convictions are not against the sufficiency of the evidence or the manifest weight of the evidence.

{¶ 61} Accordingly, Bright's fifth and sixth assignments of error are overruled.

## G. Reagan Tokes and Life Sentence

{¶ 62} Under Bright's seventh assignment of error, he argues, and the State concedes, that the sentencing entry is incorrect because it states, "[t]he sentence imposed upon the defendant is an indefinite sentence under SB 201 — The Reagan Tokes Law, under SB 201 the aggregate minimum term imposed by the court is life 25 years before eligibility for parole, if granted parole the maximum term is 37.5 years, under Reagan Tokes." (Journal Entry, May 11, 2023). Both parties agree that the Reagan Tokes Act does not apply to sentences that carry a life-tail. In addition, both parties agree that the court properly stated Bright's sentence on the record at the sentencing hearing.

{¶ 63} "'The function of a nunc pro tunc entry is not to change, modify, or correct erroneous judgments, but merely to have the record speak the truth.'" *State v. Kimmie*, 2013-Ohio-2906, ¶ 20 (8th Dist.), quoting *Ruby v. Wolf*, 39 Ohio App. 144, 147, (8th Dist. 1931). A nunc pro tunc entry is properly used to reflect "'what the court actually decided.'" *State v. Dejesus*, 2023-Ohio-2485, ¶ 34 (8th Dist.), quoting *State ex rel. Cruzado v. Zaleski*, 2006-Ohio-5795, ¶ 19.

{¶ 64} The record reveals that at the sentencing hearing the court properly sentenced Bright to 25 years to life under R.C. 2971.03(B)(1)(b) because he was convicted of rape of a child under ten years of age in violation of R.C. 2907.02(A)(1)(b); however, the sentencing entry is incorrect. Therefore, the case is remanded to the trial court for a nunc pro tunc correction of the sentencing entry.

**{¶ 65}** Accordingly, Bright's seventh assignment of error is sustained.

### III. Conclusion

**{¶ 66}** We conclude that Bright's defense counsel was not deficient, and that the trial court did not commit plain error. Further, his convictions were not against the sufficiency or manifest weight of the evidence. Therefore, Bright's convictions are affirmed. However, we remand the matter to the trial court to correct its sentencing entry.

**{¶ 67}** Accordingly, the judgment is affirmed and remanded to the trial court solely for the purpose to issue a nunc pro tunc correction of the sentencing entry deleting the Reagan Tokes language. The entry should read 25 years to life.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
EILEEN T. GALLAGHER, J., CONCUR